IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONNOR D. S.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | NO.  23-2866 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                              September 30, 2025

Plaintiff seeks review of the Commissioner's decision denying his application for

disability insurance benefits ("DIB") under Title II of the Social Security Act.  For the

reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") is supported by substantial evidence.

## I.    PROCEDURAL HISTORY

Plaintiff filed his DIB application on April 6, 2021, tr. at 123, 211-12, alleging

disability from October 30, 2019, as a result of diminution of the brain, post-concussion

syndrome, meniscus tear in the left knee, possible tuberculosis, cervical disc

bulging/separation, and possible multiple sclerosis ("MS").  Id. at 234.[2]  His application

---

[1]Consistent with the practice of this court to protect the privacy interests of
plaintiffs in social security cases, I will refer to Plaintiff using his first name and last two
initials.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D.
Pa. June 10, 2024).

[2]The Disability Report refers to "demonition of the brain," tr. at 234, but in the
context of the medical record, this appears to be a misspelling of "diminution."
To be entitled to DIB, Plaintiff must establish that he became disabled on or
before his date last insured.  20 C.F.R. § 404.131(b).  The Certified Earning Record

was denied initially, id. at 109-22, and on reconsideration, id. at 124-34, and he requested

an administrative hearing.  Id. at 160-61.  After holding a hearing on June 16, 2022, id. at

48-85, the ALJ issued an unfavorable decision on July 25, 2022.  Id. at 18-40.  The

Appeals Council denied Plaintiff's request for review on April 18, 2023, id. at 1-3,

making the ALJ's July 25, 2022 decision the final decision of the Commissioner.  20

C.F.R. § 404.981.  Plaintiff sought review in this court on July 27, 2023, Doc. 1, and the

matter is now fully briefed and ripe for review.  Docs. 11-13.[3]

## II.    **LEGAL STANDARD**

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97,

103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v.

---

indicates and the ALJ found that Plaintiff was insured through June 30, 2020.  Tr. at 19,
222.

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 3.

NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.

Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.    If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claim

In her July 25, 2022 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since October 30, 2019, the alleged onset date.  Tr. at 21.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of disorders of the spine, left knee disorder, migraines, obesity, postural orthostatic tachycardia syndrome ("POTS"),[4] depressive disorder, anxiety disorder, attention deficit disorder, and traumatic brain injury (with associated post concussive syndrome, vertiginous syndrome, convergence disorder, and vision disorder), and that several other conditions were not severe.  Id. at 21-23.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 23.

The ALJ determined that Plaintiff retains the RFC to perform sedentary work with the following restrictions:

> [He] could occasionally balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; had to avoid concentrated exposure to extreme cold, humidity, vibration, fumes, odors, dust, gases, and poor ventilation; had to avoid all exposure to hazards including moving machinery

---

[4]POTS is characterized by a rapid heartbeat triggered by rising from a reclining to a standing position.  Dorland's Illustrated Medical Dictionary (33rd ed. 2020) ("DIMD"), at 1482, 1838.

and unprotected heights; could perform work in a moderate or
quieter environment; required the use of a cane as needed for
ambulation; could understand, remember, and carry out
routine and repetitive tasks requiring no more than normal
breaks; and could have no frequent changes in the work
setting.

Tr. at 27-28.  Based on testimony from a vocational expert ("VE"), the ALJ found that

Plaintiff is unable to perform his past relevant work as a teacher aide, but that other jobs

exist in the national economy that he can perform, such as addressing clerk, document

preparer, and assembler.  Id. at 38-40.  As a result, the ALJ concluded that Plaintiff is not

disabled.  Id. at 40.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence

because the ALJ (1) erroneously failed to find at step three that Plaintiff's medical

condition met or equaled a Listing, and (2) committed various legal errors, thereby

undermining her determination that Plaintiff could perform a range of sedentary,

unskilled work.  Docs. 11, 13.[5]  Defendant responds that the ALJ's opinion is supported

by substantial evidence.  Doc. 12.

---

[5]For ease of discussion, Plaintiff's enumerated claims, see Doc. 11 at 1-2, have
been combined and renumbered.  Plaintiff has made review of his claims unnecessarily
difficult by failing -- in violation of the Court's Standing Order -- to reference pages in
the record in support of his arguments.  See Standing Procedural Order for Cases Seeking
Social Security Review (E.D. Pa. Dec. 5, 2022) (Doc. 8 ¶ 3) ("Plaintiff's brief shall
reference the supporting evidence in the record by page number and, if available, line or
paragraph.").  Indeed, his briefing contains only one such citation, an indirect citation on
the last page of his reply brief.  See Doc. 13 at 5 (noting the ALJ's citation to tr. at 424).
The record in his case is over 2,000 pages long, making it all the more critical for the
parties to include record citations supporting their arguments. See Atkins v. Comm'r of
Soc. Sec., 810 F. App'x 122, 129 (3d Cir. 2020) (declining to scour the record where
appellant failed to provide direction as to specific reports at issue, stating "[j]udges are
not like pigs, hunting for truffles buried in the record") (citation omitted).

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on March 10, 1995, and thus was 25 years of age at the time of his date last insured (June 30, 2020). Tr. at 56, 211, 244. He is six feet, two inches tall and weighed 238 pounds when he applied for benefits. Id. at 56, 234. Plaintiff completed four years of college and has prior work as a teacher's aide working with students with disabilities. Id. at 57, 61.[6] He resided with his parents during the relevant period (October 2019-June 2020). Id. at 69.

At the administrative hearing, Plaintiff testified that he is unable to work due to a workplace head injury sustained on October 30, 2019. Tr. at 63.[7] The head injury caused immediate symptoms including dizziness, headaches, and vision difficulties including double vision, blurriness, and a convergence issue. Id. at 63, 65, 67. He returned to work for 3 days in November 2019 and 4 days in January 2020, explaining that he had to take sick days for doctors' appointments, physical therapy ("PT"), and pain related to the reinjury of his shoulder. Id. at 58-59. During this period, he had light duty work restrictions consisting of frequent breaks, computer only, and no gym duty, although he

---

[6]Plaintiff stated in his Disability Report that he completed two years of college, tr. at 235, but his testimony and other references in the record confirm that he completed four years. Id. at 57.

[7]Although not discussed at the hearing, medical records show that on October 30, 2019, Plaintiff's head injury occurred when he was struck in the right frontal region of his head with a basketball while at work. See, e.g., tr. at 424.

6

was usually posted outside the gym.  Id. at 59-60.[8]  On January 30, 2020 – Plaintiff's last

day of work, id. at 58 – he passed out while posted at the gym, woke up in the nurse's

office, and was taken to the emergency room and told that he "had a seizure or

something."  Id. at 60.  He was cleared to return to light duty in May 2020, by which time

the school was shut down due to the Covid-19 pandemic.  Id. at 58-59.  Plaintiff stopped

driving in about April or May 2020, id. at 57, explaining that he did so after a couple

minor accidents, even though his doctors cleared him to drive.  Id. at 67.

Plaintiff testified that he uses a cane due to dizziness and knee pain.  Tr. at 62.  He

explained that a cane was not prescribed and that he started using one in June 2019 after

experiencing a torn meniscus at work.  Id.  Plaintiff started using the cane full-time

following his seizure in January 2020, explaining that he "could not stand the level of

dizziness that I was feeling and constantly feeling like I was going to fall."  Id. at 63.  He

stated that cranial manipulations were the only treatment that had any positive effect on

his dizziness, but that the relief only lasted a week at a time.  Id. at 64.  Medications did

not provide relief.  Id. at 68-69.  As for headaches, Plaintiff explained that they are

associated with noise and light sensitivity, and nausea which worsened during the

relevant period.  Id. at 65-66.  He also described difficulties with memory and recall, such

as forgetting his name and where he was going a week after the injury, he needed help

from staff to do his job, and he had trouble forming sentences and talking.  Id. at 66-67.

---

[8]When asked how he tolerated his time in front of the computer, he responded,
"Not well," noting that although doctors said he needed frequent breaks due to his vision
and neck issues, he was not provided with breaks.  Tr. at 68.

Plaintiff testified that his parents started going with him to doctors' appointments after his January 2020 hospital visit because he would get home and not remember going to the doctor or what was said.  Tr. at 70.  He often forgets to brush his teeth, he does not shave because his hands shake, he is fearful of showers and getting dressed because of the risk of falling, and he sometimes needs help going to the bathroom because of dizziness or blood pressure spikes -- all of which he thinks were occurring prior to his date last insured in June 2020.  Tr. at 70.[9]

Plaintiff's mother, Deborah Soles, also testified at the administrative hearing.  Tr. at 73-75.  She worked outside the home as a teacher until the Covid-19 pandemic, when she transitioned to teaching remotely from home.  Id. at 73-74.  She stated that during the 8 months following Plaintiff's head injury, "he went from a normal functioning early adult to not being able to do anything."  Id. at 73.  Plaintiff needed reminders to change clothes and take a shower and he needed help for "[b]asically . . . everything."  Id.  She could not go to the store and leave him by himself because she was afraid that he would pass out, and he often would lean up against her because he became dizzy.  Id.  She did

---

[9]Plaintiff's testimony is largely consistent with his adult function reports and pain and seizure questionnaires.  For example, Plaintiff indicated that he has difficulty with concentration, mood swings, standing or sitting for long periods, remembering to take his medication, and performing personal care and activities of daily living, as well as trouble understanding, remembering, seeing, speaking, comprehending, and coping with stress or changes in routine.  Tr. at 295-303.  In his pain and seizure questionnaires, Plaintiff reported that he could not drive or be left alone for long periods due to psychogenic seizures, with confusion, word slurring, blurred vision, weakness, vomiting, and blood pressure fluctuations.  Id. at 334-37.  He also reported diffuse body pain with movement, as well as headaches and double vision, which make it difficult to use a computer, concentrate, or perform personal care and chores.  Id. at 305-06.

not notice any improvement in his condition from March 2020 through June 2020, when she worked from home.  Id. at 74.

A VE also testified at the administrative hearing.  Tr. at 75-85.  The VE classified Plaintiff's past relevant work as a teacher aide as semi-skilled and light, although "heavy-end medium exertional level" as Plaintiff performed it.  Id. at 75.  Based on the hypothetical for sedentary work posed by the ALJ with the limitations included in the ALJ's RFC assessment, see supra at 4-5, including a cane as needed for ambulation, the VE testified that such an individual could perform unskilled jobs such as addressing clerk, documents preparer, and assembler.  Id. at 78.  If the hypothetical individual required the use of a cane for ambulation and balance, the VE testified that Plaintiff would be precluded from the identified jobs.  Id. at 84.

C.    **Medical Evidence Summary**[10]

On March 20, 2018, during an office visit at Crozer-Chester Medical Center ("CCMC"), Plaintiff reported several weeks of almost daily headaches, a past history of migraine headaches and asthma, and current complaints of joint pain.  Tr. at 352, 354.  A physical examination yielded normal results, id. at 354-55, and an x-ray of the cervical spine performed on March 29, 2018, was also normal.  Id. at 360.  At a follow-up on May 15, 2018, Plaintiff's past medical history included migraine headaches, asthma,

---

[10]As previously noted, supra at 5 n.5, Plaintiff fails to support his claims with the requisite citations to specific portions of the administrative record.  The court's review of the medical record will be limited to those portions deemed most pertinent to evaluating Plaintiff's claims.

depression/anxiety, and GERD.[11]  Id. at 401.  A physical examination again yielded

normal results, id. at 403, and the doctor's impressions included asthma, headaches, and

high blood pressure (hypertension).  Id. at 403-04.  On June 4, 2018, Plaintiff's

headaches were characterized as occasional and tension related, id. at 371, 373, and the

attending physician increased Plaintiff's dosage of Lexapro and prescribed Imitrex.[12]  Id.

at 373.  On July 13, 2018, an MRI of Plaintiff's brain yielded normal results.  Id. at 849-

50.  On August 21, 2018, Plaintiff reported that his migraines and gastrointestinal

systems had improved.  Id. at 405.

In May 2019, Plaintiff noted a sudden onset of pain and a pop sensation in his left

knee after lifting a wheelchair with a client over a step, and he reported pain in his left

knee and a sensation of buckling.  Tr. at 1491.  X-rays of his knees performed on May 10,

2019, indicated a contusion and were otherwise normal.  Id. at 1179.  A subsequent left

knee MRI performed on June 10, 2019, revealed a medial meniscal tear.  Id. at 1144,

1181-82, 1494-95.

On October 30, 2019 -- Plaintiff's alleged onset date -- he was hit with a

basketball on the right side of his head while at work, breaking his glasses and causing

disorientation, nausea, headache, blurry vision and trouble walking.  Tr. at 377.  A CT

---

[11]GERD, or gastroesophageal reflux disease, is a condition principally
characterized by heartburn or regurgitation.  DIMD at 526, 764.

[12]Lexapro (generic escitalopram) is an antidepressant used to treat certain types of
depression and anxiety.  See https://www.drugs.com/lexapro.html (last visited Sep. 4,
2025).  Imitrex (generic sumatriptan) is a headache medicine.  See
https://www.drugs.com/imitrex.html (last visited Sep. 29, 2025).

scan of Plaintiff's head showed no acute intracranial abnormality.  Id.  At a follow-up on November 8, 2019, with CCMC primary care provider Aaron Best, D.O., Plaintiff reported that he experienced some amnesia on the day of the incident and had developed difficulty with cognition, dizziness, and nausea.  Id. at 411.  Dr. Best assessed Plaintiff with a concussion without loss of consciousness.  Id. at 416.[13]

On November 20, 2019, Brian McDonald, D.O, performed a physiatry consultation at Main Line Health.  Tr. at 423-29.  Dr. McDonald noted that Plaintiff suffered a concussion with no loss of consciousness and a brief period of posttraumatic amnesia lasting a couple minutes.  Id. at 424.  Plaintiff reported severe headaches, pressure-like in quality, intermittently lasting 30 -to- 60 minutes in duration and alleviated with rest and over-the-counter pain medication.  Id.  He also reported neck pain, nausea and dizziness (described as both lightheadedness and vertigo), denied any loss of balance or diplopia,[14] and endorsed blurred vision and photophobia,[15] cognitive slowing, fogging, impaired concentration and memory, excessive fatigue, and increased irritability.  Id. at 424-25.  Plaintiff stated that he could perform activities of daily living independently and ambulate without an assistive device, and that he had stopped driving due to increased anxiety.  Id. at 424.  Upon examination, Plaintiff exhibited motion

---

[13]The medical record is inconsistent as to whether Plaintiff reported that he lost consciousness as a result of the basketball striking his head.  Compare tr. at 377, 411, 424 (no loss of consciousness) with id. at 388 (was "knocked out").

[14]Diplopia is also known as double-vision.  DIMD at 518.

[15]Photophobia is an abnormal visual intolerance for light.  DIMD at 1414.

sensitivity on eye muscle testing and cervical spine tenderness.  Id. at 428.  Dr.
McDonald diagnosed Plaintiff with concussion, posttraumatic headache, neck pain,
dizziness, and oculomotor dysfunction; referred him to outpatient concussion therapy
including occupational and vestibular therapy; and referred him for cognitive testing and
a neuropsychological screening.  Id.  Plaintiff could resume driving.  Id.

On December 2, 2019, Plaintiff began PT for symptoms of cervical spine strain
and a mild concussion, including migraines if reading for more than 30 minutes and
intermittent headaches with reading or typing.  Tr. at 389.  The physical therapist opined
that Plaintiff's rehab potential and discharge prognosis were good.  Id. at 391.  Ten days
later, during a follow-up with Dr. McDonald, Plaintiff reported having neck and shoulder
pain, headaches 2 -to-3 times per week, with reading tolerance of 60 minutes and no
issues with driving.  Id. at 431.  Upon examination, Plaintiff exhibited cervical tenderness
with otherwise normal physical and mental status findings.  Id. at 435.  Dr. McDonald
noted improvement in Plaintiff's headaches, dizziness, and oculomotor functioning, and
cleared him to return to work part-time, sedentary, 4 hours per day and 3 times per week.
Id.

During PT on January 6, 2020, after 15 treatment sessions, Plaintiff was noted as
showing some improvement, with 4+/5 bilateral strength except left triceps extension and
shoulder abduction 4/5 on the left with pain, and intact sensation throughout.  Tr. at 394.
Plaintiff had returned to work part-time on light duty, and experienced an increase in his
shoulder and neck pain as well as lightheadedness and dizziness.  Id.

On January 9, 2020, Plaintiff returned to Dr. Best for complaints of neck and left shoulder pain.  Tr. at 419.  The doctor prescribed cyclobenzaprine.[16]  Id. at 421.

On January 15, 2020, Maureen Perno, Psy.D., performed a neuropsychological screening evaluation on referral from Dr. McDonald.  Tr. at 443-47.  Dr. Perno noted that Plaintiff had been cleared to return to work following his head injury but that he could not tolerate it due to increased symptoms, and that he continued to participate in occupational and vestibular therapy but had experienced an increase in post-concussion symptoms and neck and shoulder pain.  Id. at 443.  The doctor assessed Plaintiff's baseline functioning in the average range, with intact performance on delayed free recall and visual working memory, and noted that his scores fell below expectations on auditory working memory, processing speed, mental flexibility, and verbal fluency, with scores ranging from extremely low to low-average.  Id. at 446.  Dr. Perno opined that Plaintiff would benefit from a course of cognitive remediation/speech therapy to target cognitive weaknesses and develop compensatory strategies to facilitate a return to work, and recommended continued light duty work outside the gym.  Id. at 447.

On January 16, 2020, an MRI of Plaintiff's cervical spine revealed a moderate, broad-based, left paracentral disc herniation at C6-7 causing a moderate to severe foraminal stenosis, a left paracentral disc herniation at C5-6, and a small herniation at C4-5.  Tr. at 462-63.

---

[16]Cyclobenzaprine (marketed as Amrix or Flexiril, among other brands) is a muscle relaxant that blocks pain signals sent to the brain.  See https://www.drugs.com/lcyclobenzaprine.html (last visited Sep. 4, 2025).

On January 23, 2020, Plaintiff went to the emergency room stating he began to pass out and thought he dislocated his collarbone.  Tr. at 878, 880.  He described the dizziness as moderate and sudden, lasting one hour, reported an episode of syncope[17] about 5 days previously, and denied associated chest pain, nausea, palpitations, shortness of breath, vision changes, vomiting, or weakness.  Id. at 880.  An x-ray of Plaintiff's right shoulder found no abnormality.  Id. at 884.

On January 30, 2020, Plaintiff presented to the emergency room for dizziness and syncope.  Tr. at 477-80, 490-91.  A CT of the head and neck showed patent intracranial and cervical vasculature and no hemodynamically significant stenosis or intracranial aneurysm, and no intracranial abnormality.  Id. at 1229-30, 1262.  At a neurology consult the following day with Adam J. Weinstein, M.D., id. at 908-14, the doctor indicated that it was difficult to rule out a complex migraine condition for Plaintiff's headaches, and that his syncope symptoms could be non-physiologic and possibly caused by a conversion disorder or psychogenic nonepileptic seizure.  Id. at 914.  Plaintiff remained on Lexapro for anxiety and Fioricet as needed for migraines.  Id. at 913-14.[18]

On February 3, 2020, Plaintiff underwent an EMG and nerve conduction tests, and while the studies were normal, the reviewing physician found clinical evidence of left C6

---

[17]Syncope is a temporary suspension of consciousness due to a generalized cerebral ischemia (blood vessel deficiency), commonly referred to as fainting.  DIMD at 949, 1788.

[18]Fioricet is a combination of the pain reliever acetaminophen, the muscle relaxant butalbital, and the stimulant caffeine, used to treat tension headaches caused by muscle contractions.  See https://www.drugs.com/fioricet.html (last visited Sep. 4, 2025).

and C7 radiculopathy.  Tr. at 840, 865, 868, 931.  On examination at Rehabilitation

Associates of the Main Line, Plaintiff exhibited limited cervical spine range of motion

with a positive Spurling's on the left,[19] and had some hyperesthesia in the left-hand digits

with numbness.  Id. at 864.  Plaintiff's balance and ambulation were normal, and range of

motion of his neck, shoulders, and all major joints of his right and left upper extremities,

were functional, with restricted cervical range of motion related to pain.  Id. at 864, 931,

947.

At a February 10, 2020 appointment with Joseph Richards, D.O., Plaintiff reported

neck pain that extended down his left arm.  Tr. at 927-31.  Plaintiff reported his pain as 4-

10/10.  Id. at 928.  On examination, he had decreased sensation to light touch in the left

C6-7 distribution, neural tension signs at the left upper extremity and limited cervical

spine range of motion with pain.  Id. at 931.  Adderall[20] had been added to Plaintiff's

medications.  Id. at 927.

On February 14, 2020, Plaintiff underwent a neuropsychological evaluation at the

Center for Neuroscience.  Tr. at 949-55.  He reported symptoms of depression and

anxiety and a history of ADHD.  Id.  Testing revealed significant weakness and

variability in attention and working memory, with linear and coherent thought processes

---

[19]Spurling's is a test to determine whether a patient suffers from cervical
radiculopathy.  DIMD at 1870.  The test consists of an examiner pressing down on the
top of the head while the patient rotates the head laterally and into hyperextension, and it
is positive when the movement elicits radicular arm pain.  Id.

[20]Adderall is used to treat attention deficit hyperactivity disorder ("ADHD").  See
https://www.drugs.com/adderall.html (last visited Sep. 4, 2025).

and a generally euthymic affect.  Id. at 950.  The evaluator recommended that Plaintiff follow-up with neurology and continue psychotherapy.  Id. at 950-51.  A subsequent 48-hour EEG was normal.  Id. at 868.

On February 28, 2020, neurologist Bryan DeSouza, M.D., performed an independent medical examination of Plaintiff.  Tr. at 933-42.  Dr. DeSouza produced a detailed narrative review of Plaintiff's medical history, current symptoms, and medications, noting that Plaintiff did not take his prescribed Fioricet or Adderall, id. at 933-36, and conducted an examination and records review.  Id. at 936-41.  The doctor opined that Plaintiff had no neurological problems associated with workplace head injury, no objective evidence from the examination of cervical radiculopathy, and that his symptoms of anxiety and headaches pre-date the workplace incident.  Id. at 941.  Dr. DeSouza further opined that Plaintiff's complaints of neck, left shoulder, and left-hand pain may date to a motor vehicle accident in 2017.  Id.  The doctor concluded that Plaintiff could return to work, including his prior work, without restrictions.  Id.

On March 11, 2020, Plaintiff complained to CCMC orthopedist Eric Lake, D.O., of concussion residuals and cervical and left upper extremity pain.  Tr. at 1129-32.  The doctor noted that Plaintiff participated in 3 months of concussion rehabilitation, without improvement, and Plaintiff reported 3 -to- 6 episodes of "blackouts" since his head injury, preceded by severe head/cervical pain and dizziness.  Id. at 1129.  Upon examination, Plaintiff appeared fatigued and uncomfortable, with poor short-term and

long-term recall, mild nystagmus[21] during bilateral lateral gaze, diminished balance on single leg stance, and full range of motion of the cervical spine with tenderness over C4 on the left. Id. at 1130. Dr. Lake noted that Plaintiff's C4 was rotated left, with tightness of the left anterior chest and a depressed right frontal bone, restricting mobility, and that he had tenderness and tightness of the connective tissue of the left shoulder. Id. Plaintiff underwent osteopathic manipulation of the cervical spine, cranium, and left shoulder. Id. At the end of March 2020, Plaintiff reported mild upper cervical pain and tightness and a persistent 3-4/10 frontal headache. Id. at 1133. His concussion symptoms had improved, but he continued to experience diminished balance, dizziness, lightheadedness, fatigue, trouble falling asleep, sleep disruption, sensitivity to light and noise, emotional upset, feeling slowdown, fogginess, difficulty concentrating and remembering, and blurred vision, with occasional flashes of light. Id. Examination findings were largely unchanged, and he again received osteopathic manipulation. Id. at 1134.

On April 9, 2020, at a telemedicine visit with the Center for Neuroscience, Plaintiff reported no recent syncope, improved vision issues and dizziness, improved memory, and improved blood pressure on medication, and that he had not taken his Adderall. Tr. at 959. On April 21, 2020, at an in-person visit with Dr. Lake, Plaintiff reported ongoing post-concussion symptoms with a decrease in light and sound sensitivity, improved memory and focus, and improved headaches, rated 3 -to- 4/10, intermittent, rare, and worse during computer use. Id. at 1137. On examination, Plaintiff

---

[21]Nystagmus is involuntary, rapid, rhythmic movement of the eyeball. DIMD at 1289.

exhibited improved short-term and long-term recall, full range of motion of the cervical spine, with tenderness over C2 which was rotated left, and tightness of the musculature surrounding the left orbit of his upper torso.  Id.  Dr. Lake again performed osteopathic manipulation.  Id. at 1138.  On April 27, 2020, Plaintiff was discharged from PT after 42 sessions, with good progress noted.  Id. at 1068.[22]

Plaintiff had a telemedicine visit with Dr. Lake on May 5, 2020, and reported doing well, with "near complete resolution of all concussion related symptoms," "occasional" headaches rated at 1-2/10 in severity, and persistent mood swings and occasional forgetfulness.  Tr. at 1141.  Physical and mental status examinations yielded normal results.  Id.  Dr. Lake concluded that Plaintiff was "doing well" and that he could "return to light duty work 8 hours a day, 5 days a week."  Id. at 1141, 1200.

On June 10, 2020 -- three weeks prior to his date last insured -- Plaintiff reported 85% improvement and near complete resolution of his symptoms for 2 -to- 3 weeks, and that PT was helpful but his symptoms slowly returned about 2 weeks prior.  Tr. at 1283. He also reported persistent frontal headaches and upper cervical pain, dizziness and occasional slurred speech, and intermittent episodes of severe anger.  Id.  On physical exam, his recall was intact, but he had tenderness and limited range of motion of the lumbosacral junction and ligaments of both S1 joints, restricting sacral mobility.  Id. at 1284.  On June 24, 2020, Plaintiff reported mood swings and difficulty focusing following his post cranial manipulation.  Id. at 1912.  Plaintiff's review of symptoms was

---

[22]A medical progress note from September 2020 indicates that Plaintiff's PT was put "on hold" due to insurance issues.  Tr. at 1714.

negative for neurologic, musculoskeletal, or psychological complaints, id. at 1915, and his physical exam was unremarkable.  Id. at 1916-17.  Plaintiff's mental status examination findings were normal except for a flat affect, and the doctor renewed Lexapro for anxiety and prescribed Adderall for two weeks after post-cranial manipulation, explaining that emotional release after such manipulation is common.  Id. at 1917.

On June 29, 2020, a PT progress evaluation indicated that Plaintiff was making good, but slow, progress as demonstrated by improved extremity strength, subjective reports, and tissue extensibility.  Tr. at 1480.  The physical therapist listed Plaintiff's limitations as driving, household work, concentration, dizziness, cervical pain, and tissue and joint restrictions.  Id.

On August 21, 2020 -- after Plaintiff's date last insured -- an MRI of Plaintiff's brain showed three regions of abnormal T2 signal, "concerning for underlying demyelinating process," and requiring further assessment.  Tr. at 1161-62.  On September 16, 2020, Plaintiff reported head, neck and shoulder pain, headaches, mood swings, dizziness, and memory troubles.  Id. at 1713-14.  No additional PT was recommended as he had plateaued, and it was noted that anxiety could be playing a role in his worsening symptomology.  Id. at 1715-16.  At that time Plaintiff had not yet had neurological follow-up regrading his abnormal brain MRI.  Id. at 1715.

On January 6, 2021, CCMC provider Eric Lake, D.O., was deposed in connection with Plaintiff's workers' compensation action.  Tr. at 1992-2041.[23]  Dr. Lake testified that he cleared Plaintiff to return to light duty in May 2020 because Plaintiff's symptoms had improved, id. at 2008-09, but that as of September 2020, Plaintiff had not fully recovered and could not return to his previous job without restriction.  Id. at 2019.[24]

The record also contains opinions of agency reviewing physicians and psychologists.  On June 30, 2021, Ethel Hooper, M.D., reviewed Plaintiff's medical records and found insufficient evidence with which to make a disability determination as part of the Initial Determination.  Tr. at 114-15.  Concurrently, Phyllis Brentzel, Psy.D., opined that Plaintiff had moderate limitation in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace.  Id. at 118-20.  He had the ability to understand, retain, and follow simple instructions

---

[23]Although the deposition transcript is dated January 9, 2020, see tr. at 1992, 2044, Dr. Lake referred to studies and events which occurred in 2020.  See, e.g., id. at 1999 (Mar. 11, 2020 office visit), 2022 (August 2020 brain MRI).  Therefore, the doctor's deposition likely occurred on January 9, 2021.

[24]Jeffrey Daly, PT, DPT, examined Plaintiff and prepared a medical source statement on June 14, 2022, two years after the expiration of Plaintiff's date last insured.  Tr. at 2063-69.  In light of the time lapse, the statement is not relevant to Plaintiff's claim.

(i.e., perform one and two step tasks), id. at 118, and could carry out short and simple instructions, make simple decisions, and sustain a routine.  Id. at 120.

On January 26, 2022, at the Reconsideration level of review, Edwin Malloy, M.D., opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours total in an 8-hour workday, and sit 6 hours total in an 8-hour workday; never climb ladders, ropes or scaffold; occasionally kneel, crouch and crawl; and frequently climb ramps and stairs, balance and stoop.  Tr. at 128-29.  He should avoid concentrated exposure to extreme cold, humidity, noise, vibration, hazards and fumes, odors, dusts, gases and poor ventilation.  Id. at 129.  Concurrently, Timothy Ostrich, Psy.D., opined that Plaintiff had moderate limitation in his ability to understand, remember, and carry out detailed instructions and to concentrate, persist or maintain pace.  Id. at 132.  He could understand and remember simple, one and two step instructions, carry out very short and simple instructions, make simple decisions, and sustain a routine.  Id. The State agency physicians concluded that Plaintiff could perform light, unskilled work, and that he was not disabled.  Id. at 133-34.

### D.    **Plaintiff's Claims**

As previously set forth, Plaintiff argues that the ALJ's decision is not supported by substantial evidence at step three, and because various legal errors resulted in a flawed RFC assessment and erroneous step five determination.  Docs. 11 & 13.  Defendant counters that the ALJ's opinion is supported by substantial evidence.  Doc. 12.

1.    The ALJ's Step Three Determination

Although Plaintiff challenges the ALJ's step-three determination in his enumerated claims, Doc. 11 at 1 (issue (1)), Plaintiff did not develop the claim, either by heading, argument or citations to the record.  The ALJ's step three determination is briefly mentioned in Plaintiff's reply brief, Doc. 13 at 4, where he lists the impairments the ALJ found to be severe and then states: "The [ALJ] then somehow determined that these impairments did not meet or equal a listed impairment.  With all of these various 'severe' injuries, it's impossible to not find that they equal at least one or more of the medically listed impairments."  Id.  Defendant does not acknowledge or address Plaintiff's purported step-three claim.  Doc. 12 at 5-16.

Despite Plaintiff's failure to develop this claim, several observations are warranted.  First, contrary to Plaintiff's suggestion, diagnoses do not equate to disability.  See Dietrich v. Saul, 501 F. Supp.3d 283, 296 (M.D. Pa. 2020) ("The mere diagnosis of an impairment or presence of a disorder alone will not establish entitlement to benefits; rather, the claimant must show how the alleged impairment or disorder results in disabling limitations.") (citing Walker v. Barnhart, 172 F. App'x 423, 426 (3d Cir. 2006)).  Second, symptoms alone do not satisfy a Listing, but rather the quantity and quality of the symptoms must be sufficient to meet or equal the specific requirements of the relevant Listing(s).  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990 ("For a claimant to show that his impairment matches a [L]isting, it must meet *all* of the specific medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis in original).

Third, at no point does Plaintiff identify which Listings he allegedly meets or equals. The omission is problematic given that the ALJ explicitly addressed Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) , 1.16 (lumbar spinal stenosis), 1.18 (abnormality of a major joint in any extremity), 2.02 (loss of visual acuity), 2.03 (contraction of the visual field in the better eye), 2.04 (loss of visual efficiency, or visual impairment, in the better eye), 2.07 (disturbance of labyrinthine-vestibular function), 11.02 (epilepsy), 11.18 (traumatic brain injury), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.11 (neurodevelopmental disorders). Tr. at 23-28. Indeed, the ALJ identified each Listing arguably applicable to Plaintiff's impairments and provided explanations as to why he failed to meet or equal each one. Id.

To the extent Plaintiff seeks to have the court reconsider or reweigh the evidence and reach a different conclusion at step three, I decline the invitation. See Taylor v. Comm'r of Soc. Sec., 826 F. App'x 224, 226 (3d Cir. 2020) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)); Rutherford, 399 F.3d at 552 ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'") (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). Remand for step three error is not warranted.

2.      The ALJ's RFC Assessment and Step Five Determination

The remainder of Plaintiff's enumerated claims may be combined into an omnibus

claim of ALJ error in her assessment of Plaintiff's RFC and her finding at step five that

Plaintiff is not disabled.  Defendant counters that the ALJ's decision is without legal error

and that her step five determination is supported by substantial evidence.  Doc. 12 at 10-

16.  I will begin by setting forth the principles that guide an ALJ's consideration of

medical opinion evidence and in fashioning an RFC assessment, and then address

Plaintiff's various claims of error.

Determining a claimant's RFC is the exclusive task of the ALJ.  See Cleinow v.

Berryhill, 311 F. Supp.3d 683, 685 n.11 (E.D. Pa. 2018) ("Surveying the medical

evidence to craft an RFC is part of the ALJ's duties.") (quoting Titterington v. Barnhart,

174 F. App'x 6, 11 (3d Cir. 2006)).  With respect to the consideration of medical opinion

evidence, the regulations direct the ALJ to focus on the persuasiveness of each medical

opinion:

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 404.1520c(a).[25]  The regulations list the factors to be utilized in considering

medical opinions; supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

---

[25]In contrast, the regulations governing applications filed before March 17, 2017,
speak in terms of the weight to be given each opinion, including controlling weight for
the opinions of certain treating sources.  20 C.F.R. § 404.1527.

factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. § 404.1520c(c)(1).  Similarly, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554; see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  Finally, an ALJ is not prohibited "from making an RFC assessment even if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary."  Doty v. Colvin, Civ. No. 13-80, 2014 WL 29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014).  As a result, differences between the ALJ's RFC determination and the opinions of the medical experts are not determinative, but rather whether

substantial evidence supports the ALJ's evaluation of the supportability and consistency of those opinions.

With these principles in mind, I turn to Plaintiff's claims of error. Plaintiff first argues that the ALJ failed to account for Plaintiff's depression and other mental impairments. Doc. 11 at 3. To the contrary, the ALJ found that Plaintiff had severe impairments of depressive disorder, anxiety disorder, and ADHD, and discussed at length whether any of these impairments satisfied a mental Listing. Tr. at 21, 26-27.[26] In her narrative summary, the ALJ noted Plaintiff's subjective complaints including difficulties with memory, recall, concentration, and getting along with others, id. at 28-30, and medical evidence including Plaintiff's mental health medications (Lexapro and Adderall), psychological tests, and counseling. Id. at 30-35. The ALJ further explained that Plaintiff's mental conditions were treated conservatively, with no psychiatric hospitalizations, and imposed no more than moderate limitations in any category of functioning, which could be accommodated by a limitation to understanding, remembering, and carrying out routine and repetitive tasks with no frequent changes in the workplace. Id. at 36. This was a greater limitation than found by the two State agency psychiatric consultants. In sum, it cannot fairly be said that the ALJ ignored Plaintiff's mental impairments.

Next, Plaintiff argues that the ALJ ignored pertinent evidence, including Plaintiff's subjective reports, a medical test, and a doctor's opinion, none of which are identified by

---

[26]Accordingly, Plaintiff's suggestion that the ALJ failed to find his mental condition severe at step two, Doc. 11 at 2 (issue (3)), is incorrect.

name, date, or citation.  Doc. 11 at 3-4.  As for the ALJ allegedly ignoring Plaintiff's

subjective report of constant pain "that interferes with most or all of his daily activities,"

Doc. 11 at 3, I note that this level of reported pain is at least somewhat inconsistent with

Plaintiff's complaints to medical providers and his testimony and function reports, all of

which the ALJ thoroughly discussed over the course of her 23-page opinion.  Similarly,

although Plaintiff avers that the ALJ ignored an unidentified "test," id. at 4, 9, the ALJ's

medical summary included reference to multiple MRIs of Plaintiff's cervical spine, brain,

and left knee.  Tr. at 22, 29, 31, 32, 35.  And although Plaintiff avers that the ALJ ignored

a treating physician's opinion without explanation, Doc. 11 at 4, Plaintiff's failure to

identify the opinion with specificity is glaring given the ALJ's thorough discussion of

each medical opinion relating to the relevant period.  Tr. at 36-37.  To the extent Plaintiff

is referring to Dr. Lake's opinion that Plaintiff's headaches and inability to concentrate

affected his ability to perform work, the ALJ explicitly considered these impairments

along with evidence of improvement and normal mental status findings.  Id. at 25-34, 35-

36.[27]  Accordingly, I find that the ALJ did not ignore pertinent evidence.  Even if the ALJ

neglected to refer to any particular piece of evidence, I note that an ALJ is not required to

cite every medical record, see Sutherland v. Comm'r Soc. Sec., 785 F. App'x 921, 928

(3d Cir. 2019) ("we do not expect the ALJ to make reference to every relevant treatment

note") (quoting Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001)), and that her

---

[27]To the extent the "test" Plaintiff refers to is the abnormal August 2020 brain MRI, tr. at 1162, that test occurred almost two months after the expiration of Plaintiff's date last insured, and Plaintiff had not yet followed up with any provider to explain or provide treatment as to that test result.

opinion should be read as a whole.  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).

In doing so, I find that the ALJ did not ignore pertinent evidence, and did not disregard

evidence for no reason or the wrong reason.  Rutherford, 399 F.3d at 554; Plummer, 186

F.3d at 429.

Plaintiff also argues that the ALJ's decision contains contradictions and that she

"went out of her way" to deny benefits to Plaintiff because he is a "younger" person.

Doc. 11 at 5.  First, there is no evidence of bias in the ALJ's opinion, and none is

reflected in the administrative hearing transcript.  The ALJ did refer to Petitioner as a

"younger individual," tr. at 39, but this was correct terminology under the regulations.

See 20 C.F.R. § 404.1563(c) (defining a "younger person" as under age 50).  Second,

Plaintiff identifies as "contradictions" certain wording which the ALJ obtained from the

medical records themselves.  For example, Plaintiff avers that the ALJ referred to "the

lack of any mobility problems" and found "all major upper joints will normal," while also

stating that Plaintiff exhibited abnormalities upon examination.  Doc. 11 at 6-7.  To the

contrary, the ALJ did not state that Plaintiff lacked mobility problems, but instead

summarized a February 2020 examination that showed functional range of motion in

Plaintiff's neck and all major joints in the upper extremities, along with a positive

Spurling's test, and noted the findings of other examinations and diagnostic tests.  Tr. at

23-24.  Plaintiff also labels as contradictory the ALJ's finding that Plaintiff could drive

despite his reported "black outs," Doc. 11 at 7, but fails to acknowledge that Plaintiff's

post-concussion treating physiatrist cleared him to drive, tr. at 428, he initially reported

no issues while driving, id. at 431, he later stopped driving due to anxiety, id. at 424, and

medical records from closer to his date last insured showed significant improvement in his symptoms.  Id. at 1141 (May 5, 2020 – Plaintiff reported doing well, with "near complete resolution of all concussion related symptoms," with "occasional" headaches rated at 1-2/10 in severity), 1283 (June 10, 2020 - Plaintiff reported 85% improvement and near complete resolution of his symptoms for 2 -to- 3 weeks).

Next, Plaintiff suggests that the ALJ erred by considering Plaintiff's obesity, calling it irrelevant and stating that it "should play no part in determining disability." Doc. 11 at 6.  This argument is specious given the ALJ's finding that obesity was a severe impairment, tr. at 21, and more importantly because the regulations require an ALJ to consider "all . . . medically determinable impairments."  20 C.F.R. § 404.1545(a)(2). Indeed, it would have been error for the ALJ to have disregarded Plaintiff's obesity.  See Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009) ("[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with [his] impairments, on [his] workplace function at step three and at every subsequent step."); Soc. Sec. R. 19-2p, "Titles II and XVI: Evaluating Cases Involving Obesity," 2019 WL 2374244, at *4 (in considering obesity in assessing RFC, ALJ must consider "all work-related physical and mental limitations, whether due to a person's obesity, other impairment(s), or combination of impairments").

In his reply brief, Plaintiff argues that the ALJ "seemed to discard the testimony of [Plaintiff's] mother," Doc. 13 at 4, implying that it was ignored.  I disagree.  The ALJ summarized Plaintiff's testimony in a single-spaced paragraph stretching more than one full page, tr. at 29-30, immediately followed by an accurate summary of Ms. Soles' brief

testimony, id. at 30, and then stated: "After careful consideration of the evidence, I find

that . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effects

of [his] symptoms are not entirely consistent with the medical evidence and other

evidence in the record for the reasons explained in this decision." Id. at 30. While this

context strongly suggests that the ALJ considered Ms. Soles' testimony, the ALJ made it

clear later in the opinion, affirmatively stating, "I have also considered the testimony of

[Plaintiff's] mother." Id. at 38. Thus, the ALJ properly considered Ms. Soles' testimony

along with Plaintiff's testimony and activities of daily living, the objective medical

evidence, Plaintiff's medical treatment, and the medical opinion evidence. Id. at 28-38.

Finally, Plaintiff argues that the VE's step five determination is not supported by

substantial evidence because the ALJ relied on VE testimony based on hypotheticals that

did not accurately portray Plaintiff's limitations. Doc. 11 at 7-8. However, an ALJ's

hypothetical questions need only include functional limitations which are supported by

the record. See Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004) ("A hypothetical

question must reflect *all* of a claimant's impairments that are supported by the record;

otherwise the question is deficient and the expert's answer to it cannot be considered

substantial evidence.") (emphasis in original) (quoting Chrupcala v. Heckler, 829 F.2d

1269, 1276 (3d Cir. 1987)); see also Rutherford, 399 F.3d at 554 (ALJ not required to

submit to the VE every impairment alleged by claimant, but rather "the ALJ must

accurately convey to the [VE] all of a claimant's *credibly established limitations*")

(emphasis in original) (citing Plummer, 186 F.3d at 431). Because the ALJ's evaluation

of the evidence and medical opinions is supported by substantial evidence, as discussed

above, the ALJ was not required to include additional limitations in the hypotheticals

posed to the VE.  I find no error.[28]

## IV.    <u>CONCLUSION</u>

The ALJ's decision is supported by substantial evidence and is free of legal error.

An appropriate Order follows.

---

[28]Plaintiff identified as an additional "issue" at the outset of his brief that the "Appeals Council ignore[d] competent medical evidence" as to his conditions, Doc. 11 at 2 (issue (2)), but provided no further argument on this point.  The Appeals Council referenced one item of evidence submitted in the appeal, a July 25, 2022 letter from a psychotherapist, which the Appeals Council did not enter into the record because it did "not show a reasonable probability that it would change the outcome."  Because the evidence was not before the ALJ, remand is appropriate only if it is new and material and there was good cause why it was not presented.  <u>See</u> <u>Matthews v. Apfel</u>, 239 F.3d 589, 594 (3d Cir. 2001) ("evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence"); <u>Gamret v. Colvin</u>, 994 F. Supp.2d 695, 698 (W.D. Pa. 2014) ("[T]he court can only judge the propriety of the decision with reference to the grounds invoked by the Commissioner when the decision was rendered.").